# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| HILDA L. SOLIS, *SECRETARY OF LABOR*, *UNITED STATES DEPARTMENT OF LABOR*, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 09-1265 |
| A-1 MORTGAGE CORPORATION, *a corporation*, MARIA MAKOZY, *individually, and* GREGORY MAKOZY, *individually*, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

### I.  Introduction

Pending before the court is a motion for summary judgment (ECF No. 88) filed by plaintiff Hilda Solis, Secretary of the United States Department of Labor (the" Secretary"), against defendant Gregory Makozy ("defendant").   This action arises from defendant's involvement with A-1 Mortgage Corporation ("A-1"), a mortgage brokerage firm.  Defendant's wife, Maria Makozy ("Mrs. Makozy"), was the president of A-1.[1]  In this case, the Secretary alleges that defendant willfully violated the requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay employees of A-1 the requisite minimum wage, failing to pay employees overtime compensation, and failing to maintain accurate records of employees' hours. The Secretary seeks back wages, liquidated damages, and injunctive relief.

---

[1] Initially, Mrs. Makozy and A-1 were co-defendants.  (Compl. (ECF No. 1).)  After A-1 and Mrs. Makozy filed for bankruptcy in the spring of 2010, the court on April 9, 2010, issued an order closing the case against defendant A-1. (ECF No. 20.)  The court issued an order administratively closing the case against Mrs. Makozy on the record at a motion hearing held on May 24, 2010.  (*See* Minute entry for Mot. Hr'g held on May 24, 2010.)

The Secretary argues that the affidavits of former A-1 employees, together with payroll checks issued by the company, demonstrate that no genuine issues of material fact exist with respect to whether the FLSA applies to defendant and whether he committed the alleged violations. Defendant responds that summary judgment would be improper largely because his own affidavit, coupled with Mrs. Makozy's testimony in her deposition in the present case as well as in a prior civil matter,[2] contradicts the Secretary's assertions.  Defendant contends that genuine issues of material fact remain about whether he is an "employer" within the meaning of the FLSA; whether he violated the FLSA's minimum wage, overtime, and recordkeeping provisions; whether he did so willfully; whether he is liable for unpaid wages and liquidated damages; and whether injunctive relief is warranted.

Because defendant failed to provide sufficient evidence relating to his denials, the court concludes that no genuine disputes exist.  The Secretary's motion for summary judgment will be GRANTED.

## II.  Factual Background

A-1, one of the original defendants in this case, was a mortgage brokerage firm located in Cranberry Township, Pennsylvania, and licensed by the Pennsylvania State Department of Banking. (Joint Concise Statement ("JCS") (ECF No. 98) ¶¶ 1-2.)  A-1 generated sales leads through radio, TV, and Internet advertisements and provided them to its loan officers.  (JCS ¶ 6.)  The company's telemarketer would follow up by telephone with these potential customers, including some in Maryland and Florida, asking them to refinance their loans. (Id. ¶ 7.)  Throughout the period of time relevant to this action, A-1's annual dollar volume of sales exceeded $500,000.  (Id. ¶ 5.)

---

[2] In the parties' Joint Concise Statement ("JCS") (ECF No. 98), the Secretary cites to the testimony given by Maria Makozy on April 7, 2008 in the case of Sandherr v. A-1 Mortgage, Inc., AD No. 04-11133, in the Butler County Court of Common Pleas.  (See Pl.'s Br. in Supp. of Mot. for Summ. J., App'x ("Pl.'s App'x") D.)

Mrs. Makozy was A-1's president, sole corporate officer, and sole shareholder.  (Id. ¶¶ 3-4.)

Defendant's degree of involvement in the management of the business is the subject of the instant

motion.  (See, e.g., id. ¶ 8.)  While the Secretary claims that it was actually defendant who managed

A-1, defendant asserts that Mrs. Makozy managed A-1's day-to-day operations and that he merely

assisted "as necessary" as a "consultant."  (Id. ¶¶ 4, 8.)

Mrs. Makozy described defendant as a "consultant."  (Id. ¶¶ 4, 13.)  When defense counsel

inquired about the basis for this characterization during a 2010 deposition, Mrs. Makozy responded:

> Q.    Was there some other reason that Mr. Makozy was acting as a
>       consultant instead of as an employee of A-1?
> A.    He was a consultant, he was never an employee of A-1.
> Q.    And why was that?
> A.    Because he was not an employee.

(Maria Makozy Dep., Def.'s Resp. to Pl.'s Statement of Material Facts, App'x ("Def.'s App'x") D

(ECF No. 94-4) at 33.)  In a previous civil action, Mrs. Makozy testified that defendant "assist[ed]"

her in the operation of A-1.  (Id. ¶¶ 8, 12.)  She permitted defendant to use the title of "manager"[3]

and left him in charge when she was not in the office.  (Id. ¶ 4.)

In the course of his duties at A-1, defendant interviewed prospective employees and made

recommendations to Mrs. Makozy about whom to hire and fire.[4]  (Id. ¶ 9, 14-15.)  Mrs. Makozy

testified in a deposition that defendant met with A-1's accountants and advertising vendors; apprised

the employees about A-1's dress code, their work hours, start times, and the duration of the work

day; called in employees' hours to ADP for payroll purposes; handled vacation requests; and trained

employees in the use of the company's mortgage origination software.  (JCS ¶ 8.)  Mrs. Makozy

acknowledged that defendant had the ability to write checks and, even if he did not personally sign

---

[3] The Secretary claims that, with Mrs. Makozy's permission, defendant also used the titles of "area manager" and "vice president." (JCS ¶ 13.) Defendant, however, denies this, and Mrs. Makozy has stated that she cannot recall whether or not she permitted him to do so.  (Id.)

[4] The Secretary asserts, and defendant denies, that he had the final say in A-1's hiring, firing, and disciplinary decisions. (JCS ¶ 9.)

them, he had at least theoretical authority to do so because he was listed as an authorized signer on A-1's bank account.  (JCS ¶¶ 8, 35; Makozy Dep., Def.'s App'x D at 45, 50-51.)

A-1's employees approached defendant with questions and work-related issues, which he attempted to resolve.  (JCS ¶ 11.)  Although defendant claims that Mrs. Makozy managed A-1's daily operations, several of the company's former employees reported that he set their work hours and the loan officers' commission rates and quotas.  (Id. ¶ 10.)  According to Mrs. Makozy, she set the terms of their compensation, while defendant discussed them with the employees.  (Makozy Dep., Def.'s App'x D at 56-57.)  The employees maintain, and defendant denies, that they only conferred with Mrs. Makozy if they needed her help with a title issue.  (JCS ¶ 16.)

Between December 2, 2001 and November 23, 2003, the Pittsburgh District Office of the Wage and Hour Division ("Wage Hour") of the United States Department of Labor ("DOL"), investigated A-1's compliance with the FLSA.  (Id. ¶ 19.)  As a result, Wage Hour determined that A-1 failed to pay its twenty-three loan officers, who worked purely on commission, a minimum wage and time and one-half for any overtime hours.  (Id. ¶ 20.)  Wage Hour concluded that A-1 did not accurately record the hours its employees actually worked and did not observe regular pay dates. (Id. ¶ 21.)  On April 10, 2004, Mrs. Makozy and defendant, who was then A-1's general manager, entered into a stipulation with the Secretary's representative in which A-1 agreed to pay all back wages and to comply with the FLSA in the future.  (Id. ¶¶ 19, 22.)

Wage Hour investigated A-1 again between November 30, 2003 and July 11, 2004.  (Id. ¶ 23.)  This investigation revealed that A-1 paid employees for their work weeks after they performed it via backdated checks and failed to record accurately the employees' hours and the commission payments they earned.  (Id. ¶¶ 25-26.)  Wage Hour concluded that A-1 failed to comply with the FLSA's requirements after the first investigation and subsequently failed to pay its employees at

least minimum wage for all the hours they worked.  (Id. ¶ 24.)  On December 22, 2004, a consent judgment was entered, imposing civil penalties on the Makozys and enjoining them from further violating the FLSA and withholding back wages.  (Id. ¶ 27.)  Mrs. Makozy signed the consent agreement as an authorized officer of the corporation, and defendant signed as a "consultant." (Id. ¶ 28.)

Wage Hour's third investigation of A-1's compliance with the FLSA's minimum wage, overtime, and recordkeeping provisions, conducted between October 1, 2005 and May 30, 2008, gave rise to the present action.  (Id. ¶ 29.)  Wage Hour's investigator, Polly Lupean ("Lupean"), concluded that A-1 failed to pay twenty-one of its employees the minimum wage for all the hours they worked each week.  (Id. ¶ 30.)  Lupean also found that twenty loan officers were paid strictly on commission and were not guaranteed a minimum wage.  (Id. ¶ 31.)  Loan officers Don Noland ("Noland") and Jeremy Wells ("Wells") stated in their declarations that they never received ADP payroll checks at all.  (JCS ¶ 39; see also (Noland Decl., Pl.'s Br. in Supp. of Mot. for Summ. J., App'x ("Pl.'s App'x") P (ECF No. 89-3) ¶ 25; Wells Decl., Pl.'s App'x R (ECF No. 89-3) ¶ 22.) Secretary Jessica Hollenberger ("Hollenberger") was not paid at all for the eight hours she worked on her last day at A-1.  (JCS ¶ 31-32.)

Defendant denies that these employees were not paid for all the hours they worked.  Id. ¶¶ 30-32.)  With the exception of Hollenberger, for which defendant cites his own affidavit, he bases these denials on Lupean "disregarding" the A-1 time sheets indicating that the employees had, in fact, worked forty hours per week.  (Id.)  Lupean, however, determined based upon her interviews with A-1's employees that those time sheets had been falsified.  (Id. ¶¶ 31-32.)

Lupean found that, while A-1's employees were issued biweekly payroll checks, defendant withheld payroll checks owed to some loan officers, including Jennifer Stuber ("Stuber") and

Deborah Stadelmyer ("Stadelmyer"), without changing the checks' issue dates, until the officers closed a loan. (JCS ¶¶ 33-34; see also Stuber Decl., Pl.'s App'x Q (ECF No. 89-3) ¶ 26; Stadelmyer Decl., Pl.'s Reply Br., Supp. App'x ("Pl.'s Supp. App'x") T (ECF No. 96-1) ¶¶ 29-30.) Lupean concluded that these loan officers were only paid minimum wage checks when their loans closed and funded, and they were owed a commission. (JCS ¶ 35, 41.) The loan officers' declarations state that those who did not close loans during a pay period were not paid during that period. (Id. ¶ 38, 40.) According to loan officer Joseph Gentry ("Gentry"), defendant told him that, if the DOL contacted him, he should report that he had "no complaints" and was paid biweekly, even though he was paid only when he closed a loan. (Id. ¶ 58.) Defendant, citing his own affidavit, denies these allegations and claims that he lacked the authority to, and did not, issue checks to A-1's employees. (Id. ¶¶ 33-35, 40-41, 59.)

The Secretary alleges that, as a result of A-1's practice of withholding checks, some A-1 employees went weeks or months without being paid. (Id. ¶ 41.) In support of this contention, the Secretary cites ADP payroll and A-1 commission checks that corroborate the employees' declarations. (Id. ¶¶ 43, 45, 47, 49.) For example, while ADP payroll checks issued to loan officer Vincent Ciminera ("Ciminera") were dated August 31, 2007, September 14, 2007, September 28, 2007, and October 12, 2007; the check processing date stamped on the back of the checks indicates that they were not deposited until October 31, 2007, the same date an A-1 commission check dated October 31, 2007 was deposited. (Id. ¶¶ 42-43.) Similarly, ADP payroll checks purport on their faces to have been issued to Gentry on July 20, 2007, August 17, 2007, August 31, 2007, and September 14, 2007, but the processing date shows that they were not deposited until October 16, 2007, which was the same date an A-1 commission check dated October 15, 2007 was deposited. (Id. ¶¶ 44-45.) Two ADP checks appear to have been issued to loan officer Paul Minutello

("Minutello") on January 6 and 20, 2006.  (Id. ¶ 48.)  The check processing date stamped on the back of the checks, however, shows that they were not deposited until March 20, 2006, more than ten weeks later, at the same time Minutello deposited an A-1 commission check dated March 13, 2006.  (Id. ¶ 49.)  Finally, an ADP payroll check purporting to have been issued to loan officer Andrew Hetes ("Hetes") on August 31, 2007 was not, according to the processing date, deposited until September 14, 2007, at the same time an A-1 commission check dated September 12, 2007 was deposited.  (Id. ¶¶ 46-47.)  In their declarations, the employees explained that they typically deposited any checks they received from A-1, whether ADP payroll checks or A-1 commission checks, within three days of receiving them, and one week at the latest.  (Id. ¶¶ 36-37, 47, 49.)

Defendant denies that the employees' paychecks were withheld.  (Id. ¶¶ 43, 45, 47, 49.)  He argues that Lupean did not account for checks for which copies of the front and back were not provided and did not verify the timing of the employees' deposits.  (Id.)  Defendant maintains that he was not responsible for issuing A-1's checks, and he argues that an employee's failure to deposit a check until a given date does not necessarily mean that the check was not, in fact, issued to the employee in a timely fashion.  (Id.)

The Secretary alleges that, when the loan officers worked more than forty hours per week, defendant did not pay them at all for the hours worked in excess of forty, let alone at time and one-half their regular pay rate.  (Id. ¶ 50.)  The Secretary claims that defendant told A-1's loan officers not to record more than forty hours per week, regardless of how many hours they actually worked. (Id. ¶ 51.)  The Secretary asserts that defendant instructed the loan officers to indicate on their time sheets that they took one-hour lunch breaks, whether or not they actually did, and not to indicate that they worked late or on weekends.  (Id. ¶ 52.)

To support these claims, the Secretary cites the declarations of several A-1 employees. Minutello, who stated that he regularly exceeded forty hours of work per week, reported that defendant returned a time sheet that accurately reflected his hours worked and instructed him not to show more than forty hours per week in the future. (Id. ¶ 53.) Defendant told Minutello to change his start times to "make [his time sheet] look more authentic." (Id. ¶ 54.) Gentry stated, while he did not record his hours at all while he was employed at A-1, in early May 2008, after Wage Hour commenced its most recent investigation, defendant asked him to return to the office to complete backdated time sheets that did not accurately reflect the hours he actually worked. (JCS ¶ 58; Gentry Decl., Pl.'s Supp. App'x J (ECF No. 96-1) ¶¶ 18, 27-30.) Hetes, Noland, and Wells also did not keep time records while working at A-1. (JCS ¶¶ 57.) Ciminera reported that he did not record his hours worked after filling out one or two time sheets when he first began working for A-1. (Id. ¶ 56.) According to Stuber, defendant told her that the DOL required that her time sheets show that she took a lunch break, even though she usually ate at her desk. (Id. ¶ 55, 60.)

Defendant denies these allegations, again claiming that Lupean "disregarded" employee time sheets showing that they worked forty hours per week. (Id. ¶¶ 50-57.) The Secretary relies upon Lupean's determination, based upon her interviews of A-1's employees, that those time sheets had been falsified. (Id.) During its investigation, Wage Hour calculated that the back wages A-1 owed to twenty-one former employees for unpaid minimum wages and overtime totaled $68,272.11. (Id. ¶ 61.) Defendant denies that any back wages are due and argues that, even if they were, Wage Hour's calculation was incorrect because Lupean based her calculation upon interviews and did not verify the amounts. (Id.) Lupean, however, explained that because she believed defendant falsified the time sheets – and keeping track of employees' hours is the employer's responsibility under the FLSA

– "there would be nothing else to review" to verify the employees' actual hours worked.  (Lupean

Dep., Def.'s App'x C (ECF No. 94-3) at 38-39.)

### III.  Standard of Review

Federal Rule of Civil Procedure 56 provides, in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.**  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a), (c)(1)(A)-(B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Liberty Lobby, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## IV. Discussion

At issue in the present motion are FLSA provisions relating to compensation, recordkeeping, and damages. Specifically, the Secretary argues that defendant violated (1) the FLSA's minimum wage requirement, 29 U.S.C. § 206 (2006) ("§ 6"); (2) the FLSA provision mandating time-and-one-half compensation for overtime hours worked, 29 U.S.C. § 207 (2006) ("§ 7"); and (3) the FLSA

requirement that employers keep accurate records of their employees' hours and compensation, 29 U.S.C. § 211(c) (2006) ("§ 11(c)").  The Secretary argues that these violations were willful and that this court should award back wages, liquidated damages, and injunctive relief.

Defendant contends that the FLSA's provisions do not apply to him because he is not, in fact, an "employer" within the meaning of the statute.  Defendant also denies having violated §§ 6, 7, and 11(c), as well as any willfulness or liability for damages.

### A.  *"Employer"*

Before the court can address whether, as a matter of law, defendant violated the FLSA, it must first settle the preliminary matter of whether or not defendant is subject to its provisions at all. The Secretary contends, and defendant denies, that he is an "employer" within the meaning of the FLSA.

### 1.  *Defining " Employer" for FLSA Purposes*

There is no dispute that A-1 was the employer of the employees in issue.  The question presented is whether defendant may also be classified as an employer of those employees.  It is clear that "[a] 'single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA].'"  In re Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig., 683 F.3d 462, 467 (3d Cir. 2012) (quoting 29 C.F.R. § 791.2(b)).  The FLSA provides in pertinent part, that an employer "includes any person acting directly **or indirectly in the interest of an employer** in relation to an employee . . . ."  29 U.S.C. § 203(d) ("§ 3") (emphasis added).  Courts have interpreted § 3's terms broadly in order to better effectuate the statute's sweeping remedial objectives.  See, e.g., Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991); Donovan v. Sabine Irrigation Co., Inc., 695 F.2d 190, 194 (5th Cir. 1983) (referencing "the firmly-established guidon that the FLSA must be liberally construed to effectuate Congress' remedial

intent"), abrogated on other grounds, McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988);

Bonnette v. Ca. Health & Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983), abrogated on other

grounds, Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985).

The United States Court of Appeals for the Third Circuit has recognized this broad approach

to the definition of an employer under the FLSA.  In In re Enterprise, the court identified a number

of decisions in which the United States Supreme Court used expansive language to describe the term

"employer" used in § 3.  In re Enterprise, 463 F.3d at 467-68.  The courts of appeals referred to the

Supreme Court's acknowledgement in Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326

(1992), that Congress defined "employer" "expansively" and explained that the definition of

"employer" had been called "'the broadest definition that has ever been included in any one act.'"

Id. (quoting  United States v. Rosenwasser, 323 U.S. 360 n.3, 363 (1945) (referring to Senator

Black's remarks on the Senate floor)).

Because of the breadth of the FLSA, the employer need not necessarily have "[u]ltimate

control" for an employer-employee relationship to exist; "even '**indirect** control' may be sufficient.

Id. at 468.  In other words, the alleged employer must exercise '**significant control**.'" Id. (emphasis

added) (quoting N.L.R.B. v. Browning-Ferris Indus. of Pa., 691 F.2d 1117, 1123 (3d Cir. 1982)).

Other courts have interpreted the term "employer" broadly enough to hold a corporation's managers

liable in their individual capacities despite the corporation's bankruptcy.  See Boucher v. Shaw, 572

F.3d 1087, 1093-94 (9th Cir. 2009); Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983);

Chung v. New Silver Palace Rest., Inc., 246 F. Supp. 2d 220, 226 (S.D.N.Y. 2002).

As noted, whether an employer-employee relationship existed between A-1 and the affected

loan officers is not at issue for the purposes of the matter at hand; rather the Secretary argues that

defendant is also an employer of the employees in issue for FLSA purposes in his individual

capacity.  Individuals acting in a supervisory capacity may be liable in their individual capacities as an employer under the FLSA.  See Haybarger v. Lawrence Cnty. Adult Prob. and Parole, 667 F3d 408 (3d Cir. 2012) (discussing an individual supervisor's liability as an employer under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., noting the definition of "employer in that act is "materially identical to that in FLSA. . . .").  In Haybarger, the court of appeals found an individual supervisor could be an employer because the FLSA would permit such individual liability.  Id. at 417.  The court referred to the language in the FMLA, which defines employer and is virtually identical to the language in the FLSA, and noted:

> Having concluded that an individual supervisor at a public agency may be held liable under the FMLA, we must next determine whether there exists a genuine dispute of material fact concerning whether [the supervisor] was Haybarger's employer under the FMLA. We return to the FMLA's statutory language, which states that an "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." § 2611(4)(A)(ii)(I). We believe this language means that an individual is subject to FMLA liability when he or she exercises "supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation" while acting in the employer's interest. Riordan v. Kempiners, 831 F.2d 690, 694 (7th Cir.1987) (discussing individual liability under the FLSA's analogous definition of an "employer"). As the Fifth Circuit explained in interpreting the FLSA's analogous employer provision, an individual supervisor has adequate authority over the complaining employee when the supervisor "independently exercise[s] control over the work situation." Donovan v. Grim Hotel Co., 747 F.2d 966, 972 (5th Cir.1984) (quoting Donovan v. Sabine Irrigation Co., 695 F.2d 190, 195 (5th Cir.1983)); see also Falk v. Brennan, 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973) (holding that a company exercising "substantial control of the terms and conditions of the work" of the employees is an employer under the FLSA).

Id.

### 2. The Enterprise Test

In In re Enterprise, 683 F.3d 462, the Court of Appeals for the Third Circuit recently developed a test to determine "whether a defendant is a plaintiff's 'employer' within the meaning of that term under the FLSA."  Id. at 468.  There, the court was faced with the question whether a

parent company was a joint employer of the assistant managers employed by certain of its subsidiaries, which primarily rent and sell vehicles to the public under the Enterprise name. Id. at 464-65. The defendant parent company moved for summary judgment on the ground that, because it was not a joint employer within the meaning of the FLSA, it could not be liable under the statute. Id. at 466-67. The district court granted the parent company's motion, and the assistant managers appealed. Id. at 466-67.

On appeal, the court of appeals affirmed the district court's grant of summary judgment. Id. at 471. In formulating a new test for determining joint employer status,[5] the court looked primarily to the tests used by the Court of Appeals for the Ninth Circuit in Bonnette, 704 F.2d at 1470, and this court in Lewis v. Vollmer of America, No. 05-1632, 2008 WL 355607 (W.D. Pa. Feb. 7, 2008). In re Enterprise, 683 F.3d at 468-70. As a result of this "melding," the court of appeals set forth the "Enterprise test," which consists of four factors:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

Id. at 469.[6] These factors, the court of appeals reasoned, "reflect the facts that will generally be most relevant in a joint employment context." Id.

The court cautioned, however, that "these factors do not constitute an exhaustive list of all potentially relevant facts, and should not be blindly applied." Id. (emphasis in original). That is, the

---

[5] The Enterprise test's applicability is not limited to factual scenarios in which a parent-subsidiary relationship exists. The court of appeals explained, that the Lewis factors upon which it modeled the Enterprise test "provide a useful analytical framework and may **generally** serve as the starting point for a district court's analysis, as they did here, **especially** in the parent-subsidiary context." In re Enterprise, 683 F.3d at 469. In this way, the court of appeals made clear that the Enterprise test has general applicability beyond parent-subsidiary situations.

[6] These factors are similar to the factors considered in Haybarger, 667 F.3d at 418.

Enterprise factors are not necessarily the "sole considerations" that enter into a determination of joint employer status. Id. at 469-70. "[O]ther indicia of 'significant control'" may be considered along with the four factors delineated above. Id. at 470. In fact, "all factors . . . are to be considered and weighed in deciding whether a joint employer status has been found" in a given case. Id. (accepting the argument that additional factors such as the corporate structure and nature of the business in which the parties were engaged should be considered). This built-in flexibility dovetails with the court of appeals' pragmatic approach in developing a new test "consistent with those considerations of the real world where such additional economic concerns are prominent," as well as the court's awareness that a joint employment determination requires "the total employment situation and the economic realities of the work relationship" to be taken into account. Id. at 469-70.

### 3. Applying the Enterprise Factors

Remaining cognizant of the summary judgment standard declared by the United States Supreme Court — the court will apply the Enterprise test to the facts of this case. Scott, 550 U.S. at 380 (2007) (quoting Matsushita, 475 U.S. at 586-87).

### a. Authority to Hire and Fire Employees

The first factor a court must examine when applying the Enterprise test to determine whether someone is an employer is "the alleged employer's authority to hire and fire the relevant employees." In re Enterprise, 683 F.3d at 469.[7] In the present case, defendant played an important role in these personnel decisions by conducting interviews and consulting with Mrs. Makozy about whom to hire and terminate or, as Lupean testified, "did all the hiring/firing" at A-1. (Lupean Dep., Def.'s App'x C at 60.)

---

[7] In Haybarger, the court commented with respect to this factor that it disagreed with the district court's determination that the power to hire and fire was dispositive. It noted: "We do not agree that the power to hire and fire is dispositive." Id. at 418 n.9.

Although defendant denies that he had the authority to make the ultimate hiring decisions, a review of the record reveals that fourteen former A-1 employees attested in their signed declarations that defendant hired them.  (Carpenter Decl., Pl.'s App'x G (ECF No. 89-3) ¶ 2; Ciminera Decl., Pl.'s App'x H (ECF No. 89-3) ¶ 2; Cipra Decl., Pl.'s App'x I ¶ 2; Gentry Decl., Pl.'s Supp. App'x J ¶ 2; Henderson Decl., Pl.'s App'x K (ECF No. 89-3) ¶ 2; Hetes Decl., Pl.'s App'x L  ¶ 2; Lewis Decl., Pl.'s App'x M  ¶ 2; McClain Decl., Pl.'s App'x N (ECF No. 89-3) ¶ 2; Minutello Decl., Pl.'s App'x O ¶ 2; Noland Decl., Pl.'s App'x P ¶ 2; Stuber Decl., Pl.'s App'x Q ¶ 2; Wells Decl., Pl.'s App'x R ¶ 2; Horan Decl., Pl.'s Supp. App'x S (ECF No. 96-1) ¶ 2; Stadelmyer Decl., Pl.'s Supp. App'x T ¶ 2.))

At the summary judgment stage, the nonmovant's evidence must be accepted as true.  Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  With this in mind, the court accepts that defendant himself did not have the ultimate authority to make A-1's hiring decisions.  The role he played in the hiring process, however, was significant.  It is undisputed that defendant personally interviewed employees, and his conduct during the interviews convinced fourteen employees that he had hired them.  In any case, defendant made hiring recommendations to Mrs. Makozy.

At the very least, defendant interviewed prospective employees and advised Mrs. Makozy about which candidates to hire; in this way, he played an important role in the hiring process.  The Court of Appeals for the Sixth Circuit described one alleged employer as "**involved in** . . . the hiring of employees," but made no mention of whether he had the ultimate decision-making authority.  U.S. Dep't of Labor v. Cole Enterprises, Inc., 62 F.3d 775, 778 (6th Cir. 1995) (emphasis added).  This analysis comports with the statement of the Court of Appeals for the Third Circuit in In re Enterprise that "[u]ltimate control is not necessarily required."  In re Enterprise, 683 F.3d at 468.

The record indicates that defendant had some degree of influence over A-1's firing decisions. Mrs. Makozy acknowledged that defendant had the authority to recommend that employees be disciplined, and Minutello stated in his signed affidavit that defendant fired him via a voicemail message.[8] (Makozy Dep., Def.'s App'x D at 56; Minutello Decl., Pl.'s App'x O ¶ 7.)  The District Court for the Southern District of New York in Yu G. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240 (S.D.N.Y. 2008), found that similar conduct with respect to termination – one alleged employer "occasionally" fired employees – was an indicator of employer status for FLSA purposes.  Id. at 265.

Viewing the record in the light most favorable to defendant, his degree of control over A-1's hiring and termination decisions was significant even if he lacked the final say over them or, as Lupean testified, "did all the hiring/firing."  (Lupean Dep., Def.'s App'x C at 60.)  "[S]ignificant control" is sufficient to establish employer status; ultimate control is not required.  In re Enterprise, 683 F.3d at 468.

### b. Authority to Promulgate Work Rules and Assignments and Set Conditions of Employment

The second Enterprise factor is "the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment:  compensation, benefits, and work schedules, including the rate and method of payment."  Id. at 469.

Because the record indicates that A-1's employees tended to work independently and did not require much additional instruction once they had been trained, the record is relatively sparse on the subject of who formulated the corporation's policies and who assigned sales leads to specific employees.  More importantly with respect to this factor, however, defendant admitted to assisting the employees with any job-related concerns and issues.  Defendant trained new A-1 loan officers on

---

[8] Pursuant to Rule 56(c)(4), affidavits in support of a motion for summary judgment must contain evidence that is otherwise admissible.  Under Federal Rule of Evidence 801(d), the out-of-court statement referenced here is not hearsay because the declarant, defendant, is a party.

the use of mortgage origination software and communicated policy information, such as the requirements of the employee dress code, to the employees.  See Reich v. Circle C Invs., Inc., 998 F.2d 324, 329 (5th Cir. 1993) (affirming the district court's finding of employer liability under the FLSA where, among other things, the alleged employer gave the employees specific instructions and informed them via inter-office memorandum about fines for violating company rules).

Like alleged employers found to be liable under the FLSA in other court decisions, defendant was heavily involved in coordinating and determining employees' schedules.  See Martin v. Selker Brothers, Inc., 949 F.2d 1286, 1294 (3d Cir. 1991) (finding "pervasive . . . control over the day-to-day operations" where, among other factors, the alleged employers regularly visited gas stations for the purpose of overseeing them); Saigon Grill, 595 F. Supp. 2d at 265 (one defendant, a restaurant owner's wife, controlled assigned work hours and controlled the employees' schedule).  Like the defendants in Selker Brothers and Saigon Grill, defendant handled A-1 scheduling issues such as vacations and dealt with the employees' hours, their start times, and the lengths of their workdays. The record contains no evidence to the contrary.

Defendant's conduct also evidenced substantial control over the employees' compensation and A-1's finances[9] in general.  Mrs. Makozy testified that he was an authorized signer on at least one of A-1's bank accounts and that he at least had the authority to write out the employees' paychecks.  (Makozy Dep., Def.'s App'x D at 45.)  The record indicates that defendant personally distributed employees' payroll and commission checks to them.  (Makozy Dep., Def.'s App'x D at 144-50.)  See Saigon Grill, 595 F. Supp. 2d at 265 (finding a restaurant owner's wife and another man tasked with managing two of the company's four restaurants to be employers for FLSA purposes in part because they actually paid the restaurant's employees their wages).

---

[9] Although "financial control" is not one of the four named factors, this supplemental analysis is "consistent with those considerations of the real world where such additional economic concerns are prominent."  In re Enterprise, 683 F.3d at 470.

Even though defendant states that he did not personally sign employees' checks on A-1's behalf, the record demonstrates that he was listed as a signer on the corporation's bank accounts and had authority to write out some company checks and to distribute the payroll and commission checks. Even if defendant did not have the authority to determine the employees' compensation, the court in Saigon Grill following a trial found a defendant who did not determine the employees' pay rates and workdays liable as an employer within the meaning of the FLSA because he nonetheless "exercised significant managerial authority in operating" two restaurants. Saigon Grill, 595 F. Supp. 2d at 246, 265. Here, the Secretary adduced evidence of defendant's authority to coordinate and determine work schedules and to control distribution of the payroll and commission checks. No evidence to the contrary was introduced by defendant and a reasonable jury could not find in defendant's favor with respect to this factor.

### c. Involvement in Day-to-Day Supervision

The third Enterprise factor is "the alleged employer's involvement in day-to-day employee supervision, including employee discipline." In her deposition, Lupean testified that "what I know is that [defendant] was involved in the day-to-day operation of A-1." (Lupean Dep., Def.'s App'x C at 60.) This type of involvement may entail, for example, substantial control of operations and employment conditions, including supervising employees. See, e.g., Falk v. Brennan, 414 U.S. 190, 195 (1973) (factoring employee supervision into a finding of "substantial control").

In Selker Brothers, the Court of Appeals for the Third Circuit found "control over the day-to-day operations" where, among other factors, the alleged employers regularly visited gas stations for the purpose of overseeing them. Selker Brothers, 949 F.2d at 1294. In another decision, the United States District Court for the Eastern District of New York held that a defendant, the brother of the president and sole shareholder of the company alleged to have violated the FLSA, was an

19

"employer" for FLSA purposes in part because he instructed the employees about the job's requirements and duties, and the employees reported to him in his brother's absence.  Chao v. Vidtape, Inc., 196 F. Supp. 2d 281, 291 (E.D.N.Y. 2002), aff'd as modified, 66 F. App'x 261 (2d Cir. 2003).

In Saigon Grill, 595 F. Supp. 2d at 265, the court held that the restaurant owner's wife was an employer under FLSA § 3 largely because she monitored the employees' performance and imposed discipline, including occasionally terminating employees.  Id. at 265.  Another defendant in the same case also faced liability as an employer on the grounds that he "exercised significant managerial authority in operating" two of the restaurants and had the authority to discipline employees, even though he did not determine the employees' pay rates and workdays; the court called the case against that defendant "a closer one."  Id. at 246, 265.

In the present case, the record's undisputed facts about defendant's supervisory role are consistent with the courts' holdings in the decisions cited above.  Like the brother of the corporation's president and sole shareholder in Vidtape, defendant here ran the A-1 office in Mrs. Makozy's absence.  As in Saigon Grill, the record indicates that defendant had some degree of influence over A-1's firing and discipline decisions.  Mrs. Makozy acknowledged that defendant had the authority to recommend that employees be disciplined.  (Makozy Dep., Def.'s App'x D at 56.)

Like the scenario in Selker Brothers in which the alleged employer regularly visited the service stations, defendant regularly interacted with A-1's loan officers.  He admitted to talking with them about and helping them to solve any problems or issues that arose in the course of their work. With respect to the loan officers' typical duties, he served as their primary contact person; in fact, many of the employees claim that he was their sole contact.  (Carpenter Decl., Pl.'s App'x G ¶¶ 4-5; Ciminera Decl., Pl.'s App'x H ¶¶ 3-7; Cipra Decl., Pl.'s App'x I ¶ 11; Henderson Decl., Pl.'s App'x

K ¶¶ 5-6; Hetes Decl., Pl.'s App'x L ¶ 9; Minutello Decl., Pl.'s App'x O ¶ 9; Noland Decl., Pl.'s

App'x P ¶ 5; Horan Decl., Pl.'s Supp. App'x S ¶ 6; Stadelmyer Decl., Pl.'s Supp. App'x T ¶ 6.)

With the exception of "title issues" that arose in the course of their duties, the record reflects that the

loan officers had little contact with Mrs. Makozy.  (Ciminera Decl., Pl.'s App'x H ¶ 10; Cipra Decl.,

Pl.'s App'x I ¶ 13; Henderson Decl., Pl.'s App'x K ¶ 7; Hetes Decl., Pl.'s App'x L ¶ 10; Minutello

Decl., Pl.'s App'x O ¶ 10; Noland Decl., Pl.'s App'x P ¶ 6; Horan Decl., Pl.'s Supp. App'x S ¶ 7;

Stadelmyer Decl., Pl.'s Supp. App'x T ¶ 7.)  The interactions between defendant and the loan

officers, as opposed to the interactions between Mrs. Makozy and the loan officers, were

disproportionate in both frequency and substance.  Viewing the record in the light most favorable to

defendant, it contains nothing to contradict the conclusion that it was defendant himself, and not

Mrs. Makozy, who was the loan officers' supervisor.  Taken as a whole, the record contains ample

evidence to support Lupean's conclusion that defendant "was involved in the day-to-day operation of

A-1" in a supervisory capacity, and there is no affirmative evidence to the contrary.  (Lupean Dep.,

Def.'s App'x C at 60.)

### d.  Control of Employee Records

The fourth Enterprise factor is "the alleged employer's actual control of employee records,

such as payroll, insurance, or taxes."  In re Enterprise, 683 F.3d at 469.  The record does not reveal

the details of who controlled A-1's tax or insurance records, but it does demonstrate that defendant

had control over employee records – in particular, time sheets.  The Court of Appeals for the Ninth

Circuit affirmed the district court's finding of individual liability under the FLSA where, among

other duties, the alleged employer was responsible for maintaining employment records.  Lambert v.

Ackerley, 180 F.3d 997, 1001–02, 1012 (9th Cir. 1999) (en banc).  Like that defendant, defendant

had some control over A-1's employment records, as he communicated to employees that they were required to fill out time sheets.  (Makozy Dep., Def.'s App'x D at 60.)

Several A-1 employees testified that defendant instructed them not to record their hours accurately, much like the defendant in Circle C Investments who directed one of the employees not to keep certain payroll records.  (Cipra Decl., Pl.'s App'x I ¶ 34; Henderson Decl., Pl.'s App'x K ¶¶ 24-26; Minutello Decl., Pl.'s App'x O ¶ 32; Stuber Decl., Pl.'s App'x Q ¶ 21; Stadelmyer Decl., Pl.'s Supp. App'x T ¶ 25.)  Mrs. Makozy's deposition testimony also indicated that defendant would call A-1's payroll in to ADP. (Makozy Dep., Def.'s App'x D at 61.) Finally, there is no evidence that is contrary to defendant having control over the time sheets, and he did not attempt to argue in his brief with respect to the recordkeeping issue that he was not responsible for time sheets.

### e.  Other Factors

In In re Enterprise, the court of appeals explicitly stated that the factors discussed above "do not constitute an exhaustive list."  In re Enterprise, 683 F.3d at 469.  The determination about whether joint employer status exists must take other factors into account where necessary for "a consideration of the total employment situation and the economic realities of the work relationship." Id.  Here, two such factors include defendant's dealings with A-1's vendors and his disputed job title.  With respect to the first, Mrs. Makozy's unextracted[10] deposition testimony considered as a whole, provided and cited by defendant, reveals that defendant served as the primary contact between A-1 and several of its vendors, including accountants and advertisers, which tends to

---

[10] In the parties' briefs, the term "unextracted" is used to refer to the transcripts of the depositions of Lupean and Mrs. Makozy, which were provided in their entirety – without pinpoint citations – and were referenced by defendant in support of some of his arguments.  See, e.g., Pl.'s Br. in Supp. of Mot. for Summ. J., at 6.  Rule 56(c) requires a party to support his or her assertion that a genuine factual dispute exists by "citing to **particular parts** of materials in the record, including depositions . . . ." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added).  Rule 56's "specific facts" requirement, as explained in Liberty Lobby, 477 U.S. at 248, is also implicated.

indicate "significant control" over the corporation's operations.  (Makozy Dep., Def.'s App'x D at 41-44.)

Second, the parties devote considerable effort in their briefs and in the JCS to the question of defendant's job title.  His title, however, represents just one consideration, in addition to those detailed above, in the determination whether, as a matter of law, he had "significant control" over A-1's daily operations and its employees' employment terms and conditions.  See Dole v. Simpson, 784 F. Supp. 538, 547 (S.D. Ind. 1991) (explaining that, in determining whether an employer-employee relationship exists for FLSA purposes, what matters is the "substance of a person's control, not the title the person holds.")  Irrespective of whether he used the title of "manager" or "independent contractor" or was the corporation's ultimate decision maker, the record demonstrates that defendant exerted significant control over A-1's daily operations by "assisting" Mrs. Makozy[11] in running the company, just as one of the defendants in Saigon Grill "assist[ed] [the restaurant's owners] in performing managerial functions."  Saigon Grill, 595 F. Supp. 2d at 246.  After all, the standard for finding an employer-employee relationship within the meaning of § 3 is one of "significant control," not "[u]ltimate control."  In re Enterprise, 683 F.3d at 468.

### f. Factor Balancing

In the final stage of the Enterprise test, the court must balance the factors discussed above in order to determine whether defendant is a joint employer within the meaning of the FLSA.  The first factor, authority over hiring and firing, is not entirely conclusive because the record does not indicate that defendant did possess the ultimate authority to make those decisions.  He is not, however,

---

[11] The parties' briefs seem, at times, to imply that defendant cannot be considered an employer for § 3 purposes if Mrs. Makozy also exercised control over A-1's day-to-day operations.  As noted, they may be joint employers.  See 29 C.F.R. § 791.2(a) ("A single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA].")  This is not the case, even if, as Lupean testified, Mrs. Makozy's involvement with A-1 was limited to signing employees' checks and that she did not control any aspect of the corporation "related to the employees." (Lupean Dep., Def.'s App'x C at 32, 60.)  An employer-employee relationship within the meaning of the FLSA requires "significant control" over employment terms and conditions on defendant's part, not "[u]ltimate control."  In re Enterprise, 683 F.3d at 468.

required to have ultimate authority; there are many other factors to consider, and only significant control is required.  Overall, because defendant did play a significant role in A-1's hiring and firing decisions, this factor tips in favor of finding that he is a joint employer.

In terms of the second factor, the authority to promulgate rules and assignments and set conditions of employment, whether defendant assigned work and promulgated rules received little attention in the record.  He possessed, however, a significant degree of control over the A-1 employees' terms and conditions of employment, particularly with respect to financial matters such as personally distributing pay checks to A-1 employees and being almost entirely responsible for scheduling for individual employees and A-1's staffing needs.  This factor weighs in favor of defendant's status as a joint employer.

The third factor involves a determination of the degree of supervision the alleged employer exercises on a day-to-day basis.  Here, the record reflects that defendant regularly interacted with the loan officers in order to assist them with work-related problems and issues, had at least some influence over the decision to discipline employees, and acknowledged that he was in charge of the office in Mrs. Makozy's absence.  Because this conduct is consistent with a supervisory role, this factor weighs in favor of the determination that defendant was an employer under §3.

The fourth factor inquiry revolves around whether the alleged employer had control over employee records.  Here, it is undisputed that defendant had responsibility for the employees' time sheets and called the payroll into the appropriate vendor.  For this reason, this factor also weighs in favor of a finding that defendant was an employer for § 3 purposes.

In addition to those listed above, two other factors, the nature of defendant's contact with A-1's vendors, as well as his job title, are relevant to the determination whether defendant is a joint employer within the meaning of the FLSA.  The record contains uncontested evidence that defendant

met with A-1's advertising and accounting vendors, and Mrs. Makozy's testimony leads to the conclusion that he, in fact, served as the primary point of contact for these vendors, which weighs in favor of defendant's status as an employer.  Finally, the job title he used is not determinative of whether or not he was an employer, as the inquiry properly focuses on the substance of the control he exerted rather than the title he used.  For this reason, even though defendant refers to himself as a "consultant" in the pleadings and briefing relevant to this action and the record supports that he did in fact use that title, the substance of his conduct in relation to A-1's employees is strongly indicative of a supervisory role.  These factors also weigh in favor of the determination that defendant was an employer under § 3.

As discussed above,  the first factor is at least neutral and more likely favors the Secretary. What the record is not conclusive about whether or not defendant actually had the authority to hire and fire employees, it does reflect that defendant had significant control over those decisions.  All the other factors weigh in favor of his joint employer status.

### 4.  The <u>*Enterprise*</u> *Factors and the Summary Judgment Standard*

The court of appeals in <u>In re Enterprise</u> took care to explain the test's applicability in the context of the summary judgment standard.  Summary judgment may be granted if "the evidence . . . so favors the [movant] that we conclude no reasonable juror could find" otherwise.  <u>See</u> <u>In re Enterprise</u>, 683 F.3d at 471.  The court of appeals emphasized, however, that a single factor that is either neutral or weighs against the determination that a party is an employer for § 3 purposes will not suffice to defeat a motion for summary judgment.  <u>Id.</u>

In fact, the court of appeals reiterated its statement that a single factor is generally insufficient three times in the opinion.  The court first "point[ed] out also that the one aspect of the District Court's analysis where the District Court found an <u>Enterprise</u> factor to be neutral cannot

affect the balance of the district Court's reasoned conclusions, with which we agree, and cannot defeat summary judgment." Id. at 470-71 (citing decisions of the Courts of Appeals for the Eighth and Ninth Circuits standing for the propositions, respectively, that a single factor will defeat summary judgment only if it changes the entire balance, and that even two factors will not suffice in the face of numerous other significant factors).

The court of appeals explained that "[w]hen a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party – this is just such a case." Id. at 171. Finally, after concluding that no reasonable juror could find for the nonmovant, the court reiterated that summary judgment was warranted "even though one factor may have been deemed to favor the plaintiffs or been found to be neutral." Id.

The same is true of the present case. While the record indicates that defendant had significant influence over A-1's hiring and firing decisions, his joint employer status was less conclusive with respect to this factor, i.e., whether the alleged employer has the authority to hire and fire. Even if ultimate ability to hire or fire was required, this factor would be somewhat "neutral" and that neutrality would not offset the ultimate conclusion: the evidence is so one-sided in favor of the Secretary that no reasonable juror could find that defendant is not an employer within the meaning of § 3.

When the court of appeals balanced the factors detailed above in In re Enterprise, it affirmed the district court's grant of the defendant parent company's motion for summary judgment on the ground that it was not a joint employer for § 3 purposes. Id. at 471. The facts of that case, however, are readily distinguishable from those of the present case. There, the parent company did not supervise or discipline employees, and it did not control employee records. Id. In the present

matter, on the other hand, there is ample evidence that defendant played a supervisory role, possessed the authority to discipline employees, and was responsible from maintaining the employees' time sheets. The court of appeals' "conclusion . . . is bolstered by the readily apparent fact that Enterprise Holdings exercised <u>no</u> control, let alone <u>significant control</u>, over the assistant managers." <u>Id.</u> (emphasis in original). In the present case, however, the record reveals that the opposite is true; defendant exercised significant control over A-1's employees.

Viewed in the light most favorable to defendant, the record contains ample evidence that defendant had at least some influence over A-1's hiring and firing decisions and had significant control over its work rules, assignments, and conditions of employment; day-to-day supervision; and employment records. Balancing these factors indicates that defendant was an employer as a matter of law. The Secretary has demonstrated that no reasonable jury could find otherwise, and defendant's evidence is insufficient to oppose that conclusion. Because no genuine dispute exists about whether defendant is an "employer" within the meaning of FLSA § 3, the court will grant the Secretary's motion for summary judgment on that issue.

### B. The FLSA's Minimum Wage Provisions

Section 6 of the FLSA requires that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce . . . or is employed in an enterprise engaged in commerce" a specified minimum hourly wage. 29 U.S.C. § 206 (2006). For FLSA purposes, this obligation[12] is met when the employer has paid, and the employee has received, the wages "finally and unconditionally." 29 C.F.R. § 531.35. The employee must actually receive the minimum wages; merely altering records to indicate that the employee was paid is insufficient. <u>Olson v. Superior Pontiac-GMC, Inc.</u>, 765 F.2d 1570, 1578-79 (11th Cir. 1985).

---

[12] The Supreme Court has repeatedly held that the minimum wage provisions of § 6 are not waivable. <u>Barrentine v. Arkansas-Best Freight Sys., Inc.</u>, 450 U.S. 728, 740 (1981); <u>see</u> <u>Brooklyn Sav. Bank v. O'Neil</u>, 324 U.S. 697, 707 (1945) ("No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act.").

While § 6 is silent on the issue of time of payment, courts have consistently recognized the FLSA's implicit requirement that employees' wages be promptly paid. Mathis v. About Your Smile, P.C., CIV.A. 02-CV-597, 2002 WL 1878894 at *2 (E.D. Pa. Aug. 14, 2002); Rogers v. City of Troy, N.Y., 148 F.3d 52, 57 (2d Cir. 1998) (recognizing that "it is clear that the FLSA requires wages to be paid in a timely fashion"); Biggs v. Wilson, 1 F.3d 1537, 1539-40 (9th Cir. 1993) (refusing to treat late payment differently from nonpayment for FLSA purposes).

Courts have, depending on the circumstances, taken slightly different approaches toward the length of time at which delayed wages are deemed "unpaid," thus violating § 6. The Court of Appeals for the Ninth Circuit, for example, has interpreted the prompt payment requirement strictly, explaining that "[t]he only logical point that wages become "unpaid" is when they are not paid at the time work has been done, the minimum wage is due, and wages are ordinarily paid – on payday." Biggs, 1 F.3d at 1540-42 (holding that two-week delay in payment in response to legislative mandate to withhold payment violated the FLSA). In Rogers, however, the Court of Appeals for the Second Circuit declined to take such a bright-line approach where the facts of the case involved a legitimate change to the employees' pay schedule that resulted in a delay of a few days. Rogers, 148 F.3d at 61. Instead, the court carved out an exception in which § 6 was not violated under those circumstances because it did "not result in an unreasonable delay in payment." Id. The Court of Appeals of the Third Circuit's approach more closely resembles Biggs' bright-line rule than Rogers' exception. See Selker Bros., 949 F.2d at 1299 (explaining that liability for liquidated damages may lie where employees do not receive their wages "at the time they were due"); Dunlop v. State of N.J., 522 F.2d 504, 512 (3d Cir. 1975) (recognizing FLSA's "immediacy of payment" requirement), vacated on other grounds sub nom. New Jersey v. Usery, 427 U.S. 909 (1976). Other courts note

that the employee must receive "at least minimum wage on payday." <u>Mathis</u>, 2002 WL 1878894 at *2.

The <u>Rogers</u> exception does not apply under the facts of the present case, in which defendant adduces no evidence of a bona fide business reason for the alleged delays in payment of the employees' minimum wages.  In fact, defendant denies that the employees' paychecks were ever withheld at all.  The Secretary, however, provides evidence to the contrary in the form of ADP payroll records and checks, commission checks issued by A-1, and the declarations of former A-1 employees.  On their faces, the payroll records and checks purport to have been issued according to a bi-weekly pay schedule.  The Secretary argues, however, that defendant in fact withheld these checks until the employees earned commissions upon closing loans, at which time the employees cashed the payroll and commission checks together.  This, the Secretary claims, explains why the bank processing dates stamped on the payroll checks fall between two and ten weeks after their issue dates, but coincide with the dates on the commission checks.  The Secretary offers the declarations of ten A-1 employees to further support these claims.  These employees claim they were only paid when they closed a loan, and several stated that they generally cashed their payroll and commission checks within one or two days of receiving them.  As a result, some loan officers went between two and ten weeks without receiving pay, and two, Noland and Wells, claim that they never received ADP payroll checks at all.

"A court should find for the moving party 'if the pleadings, depositions . . . and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (quoting <u>Liberty Lobby</u>, 477 U.S. at 247).  Here, the Secretary has supported her allegations that defendant violated § 6 with specific facts and evidence, including the

checks and records discussed above and sworn declarations based upon employees' personal knowledge.

> The moving party need not produce evidence to disprove the opponent's claim but does carry the burden to demonstrate the absence of any genuine issues of material fact. If the movant has produced evidence in support of summary judgment, then the opponent may not rest on the allegations set forth in its pleadings but must counter with evidence that demonstrates a genuine issue of fact. This, in turn, requires the opponent to "set forth specific facts showing that there is a genuine issue for trial."

Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992) (internal citations omitted) (quoting Celotex Corp., 477 U.S. at 323). Because the Secretary, as the moving party, made a showing that there is no genuine issue about whether defendant violated § 6, defendant "must set forth specific facts showing that there is a genuine issue for trial" but "may not rest upon the mere allegations or denials of the . . . pleading." Saldana, 260 F.3d at 232 (internal citations omitted).

In his attempt to rebut the Secretary's allegations that he violated the FLSA's minimum wage provisions, defendant relies upon his own affidavit, which denies the Secretary's averments. In paragraph 8 of the affidavit, defendant declares:

> Furthermore, during the course of my consulting with A-1 Mortgage, all employees were paid in full for all hours that they worked, and payment was issued on a bi-weekly basis. I am not aware of any employee who in fact did not receive full payment for the hours that they [sic] worked, and the checks of the employees were not withheld for any reason from the employees.

(Gregory Makozy Aff., Def.'s App'x B (ECF No. 94-2) ¶ 8.) This averment, however, is not enough to defeat the Secretary's motion. "To survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at

325).  The Court of Appeals for the Third Circuit has held that "conclusory, self-serving affidavits" will not suffice.  See, e.g., Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002).

Faced with similar affidavits, the Court of Appeals for the Third Circuit held in Hurd v. Williams, 755 F.2d 306 (3d Cir. 1985), that they were insufficient to demonstrate the existence of a genuine issue of material fact because they were based on the affiant's "opinion, not fact, and the affidavits fail to set forth a sufficient basis for the introduction of lay opinion under Rule 701 of the Federal Rules of Evidence as based on first-hand knowledge or observation."  Id. at 308.  The portion of paragraph 8 in which defendant acknowledges his own lack of personal knowledge – "I am not aware of any employee who in fact did not receive full payment for the hours that they [sic] worked" – is, therefore, particularly problematic.  (Gregory Makozy Aff., Def.'s App'x B ¶ 8.)

The rest of paragraph 8 of the affidavit – "all employees were paid in full for all hours that they worked, and payment was issued on a bi-weekly basis. . . . [T]he checks of the employees were not withheld for any reason from the employees" – essentially constitutes, impermissibly, a restatement of the denials of the pleadings.  See Saldana, 260 F.3d at 232.  As such, it likewise fails to "present **affirmative evidence** in order to defeat a properly supported motion for summary judgment," as required by the Supreme Court.  Liberty Lobby, 477 U.S. at 257 (emphasis added).  In the words of the court of appeals, "the affiant must ordinarily set forth facts, rather than opinions or conclusions.  An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden."  Maldonado v. Ramirez, 757 F.2d 48, 51 (3d Cir.1985) (alteration in original) (internal quotation marks omitted).  It is well established that a mere scintilla of evidence is insufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-movant]."  Liberty Lobby, 477 U.S. at 252; see Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  A genuine issue for trial

does not exist "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita, 475 U.S. at 587. Here, a reasonable jury could not do so based upon defendant's unsupported denials alone.

Defendant cites, with no pinpoint, Mrs. Makozy's unextracted deposition testimony. This citation fails to satisfy Rule 56's "specific facts" requirement as explained in Liberty Lobby, see 477 U.S. at 248. Defendant did not fulfill his Rule 56(c) obligation to support his assertion that a genuine factual dispute exists by "citing to **particular parts** of materials in the record, including depositions . . . ." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Mrs. Makozy's deposition testimony fails to support defendant's argument that he paid the employees in full on a bi-weekly basis. (See Mrs. Makozy Dep., Def.'s App'x D at 144-50.) For example, she never saw defendant deliver the employees' commission checks to them:

> Q.   . . . I asked did you see [defendant] hand commission checks to people who were working for A-1 Mortgage Corporation?
> A.   I didn't see him do it. I would give it to him and tell him to do it.

(Id. at 147.) Nor did she see defendant consistently deliver the employees' payroll checks:

> Q.   Now we're talking about payroll checks.
> A.   I seen [sic] him giving them out sometimes, but I can't say that he definitely gave them out.

(Id. at 149.) Mrs. Makozy ultimately admitted in the following exchange with counsel for the DOL that she had no personal knowledge about whether and when defendant actually delivered the checks to the employees:

> Q.   I'm not asking if [defendant] would have [distributed the payroll checks on the day he received them from Mrs. Makozy], I'm asking did he, and how do you know that he did?
> A.   I gave him the checks and he gave them out. I might have saw [sic] him give them out a couple of times, but I didn't go

> every time and follow behind him or I could have just given
> them out myself, if I wanted to do that.
>
> Q.   So you don't actually know firsthand whether he put those
>       checks out the day he received them?
>
> A.   If they were signed, then I gave them to him, and he gave
>       them to them.
>                              * * *
> Q.   But you can't explain to me how you knew that he gave them
>       out that same day, can you?
>
> A.   Because I gave them to him.
>
> [DEFENSE COUNSEL]:    Beyond that, do you have another
>       reason?
>
> [MRS. MAKOZY]:   No.

(Id. at 149.)  Not only does Mrs. Makozy's testimony fail in this manner to support defendant's

arguments, it provides further support for the Secretary's proposition that defendant had the

authority to write out the checks that gave rise to the alleged violations.  See Def.'s App'x D at

50-51.[13]

Defendant speculates, without factual support, that the inconsistency between the payroll

checks' issue dates and processing dates does not necessarily mean the checks were withheld, as the

employees could simply have delayed cashing their checks.   Faced with a summary judgment

motion, the court is obliged to draw all reasonable inferences and resolve all doubts in favor of the

nonmoving party.  Doe, 242 F.3d at 446.  Even so, the inference that employees to whom minimum

wages are owed would delay cashing their paychecks for a period of several weeks to several

months, is simply not reasonable.  Defendant cannot overcome the evidence provided in support of

the Secretary's motion on these grounds.

---

[13] The court notes that in ¶ 10 of defendant's affidavit he states that "I was not responsible for the issuance of any checks, including pay checks, and in fact, did not sign or have the authority to sign any checks on behalf of the company." (ECF No. 95-1 ¶ 10.) An affidavit, however, cannot be used to create an issue of fact that contradicts that party's other evidence. United States v. One 107.9 Acre Parcel of Land, 898 F.2d 396, 399-400 (3d Cir. 1990) overruling recognized on other grounds, United States v. Premises Known as RR # 1, Box 224, 14 F.3d 864 (3d Cir. 1994). In the present situation, Mrs. Makozy's testimony directly contradicts defendant's statements, indicating that he was authorized to sign checks, and did, on occasion, write out checks. (Makozy Dep., Def.'s App'x D at 45, 144-50.)

Because there is no genuine dispute about whether defendant violated the FLSA's minimum wage provisions, the Secretary is entitled to judgment as a matter of law.  Summary judgment will, therefore, be granted on that issue.

### C.  The FLSA's Overtime Provisions

Section 7 of the FLSA provides, in pertinent part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce . . . or is employed in an enterprise engaged in commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Generally, employers must pay their employees at least one and one-half times their regular pay rate for any time they work in excess of forty hours per week in order to comply with § 7.  Parker v. NutriSystem, Inc., 620 F.3d 274, 277 (3d Cir. 2010).  The FLSA provides several exemptions from § 7's requirements, such as the "retail commission exception," Parker, 620 F.3d at 277 (explaining that exemption under 29 U.S.C. § 207(i) applies to employees of retail or service establishments), and the "administrative exception."  Swartz v. Windstream Commc'ns, Inc., 429 F. App'x 102, 104 (3d Cir. 2011) (excepting those employed in a bona fide executive, administrative, or professional capacity pursuant to 29 U.S.C. § 213(a)(1)).  Otherwise, § 7 prohibits employers from working their employees for workweeks longer than forty hours without paying them time and one-half for the excess hours worked.  Brock v. Claridge Hotel & Casino, 846 F.2d 180, 183 (3d Cir. 1988).

The Secretary claims that defendant failed to pay A-1's employees this overtime premium when they worked more than forty hours per week.  In support, she cites the declarations of several former A-1 employees, all of whom assert that their workweeks averaged more than forty hours but

state that they were not paid time and one half for those hours.  Defendant does not contend, and the record does not indicate, that any exceptions to § 7's overtime requirements apply.  Instead, defendant argues that no overtime premium was owed to these employees because they were, according to the payroll checks issued and the employees' time sheets, paid in full for the hours they worked.

To support her allegation, the Secretary points to the affidavits of several former A-1 employees to support her motion for summary judgment with respect to the overtime issue.  The record reveals that seven former A-1 loan officers stated in their declarations that they worked, on average, more than forty hours per week, but were not paid the requisite time and one half for their overtime hours.  Ciminera reported that he averaged 41.25 to 42.5 hours per week, but was not paid at all for his hours over forty and, therefore, not at time and one half.  (Ciminera Decl., Pl.'s App'x H ¶¶ 28-30.)  Lorraine Cipra ("Cipra"), who stated that she averaged 45-48 hours per week because she "worked late some evenings and worked on Saturdays for a couple of hours each week" also was not paid at all for her hours worked over forty.  (Cipra Decl., Pl.'s App'x I ¶¶ 28-30, 32-34.)

Minutello declared that he averaged between 42.5 hours per week for three weeks per month and 50.5 hours one week per month in 2005 and fifty-three hours per week in 2006, but stated that he was not paid for any hours he worked over forty.  (Minutello Decl., Pl.'s App'x O ¶¶ 25, 28, 30.)  Similarly, Wells stated that he worked, on average, forty-eight hours for three weeks per month and fifty-two hours one week per month, but was not paid for any hours he worked over forty.  (Wells Decl., Pl.'s App'x R ¶¶ 16, 18-19.)  Robert McClain ("McClain") stated that he was not paid at all for any hours worked over forty per week, even though he averaged 43.5 per week.  (McClain Decl., Pl.'s App'x N ¶¶ 7-9.)  Stuber declared that she was not paid time and one half for the hours she worked over forty per week, despite averaging forty-five hours per week and "sometimes . . . even

more hours." (Stuber Decl., Pl.'s App'x Q ¶¶ 16-17, 21.)  Finally, Stadelmyer stated that she was

not paid time and one half for hours over forty, despite averaging between fifty and fifty-one hours

per week for three weeks per month and forty-six hours per week one week per month between the

beginning of the time period relevant to this action and November 2006.  (Stadelmyer Decl., Pl.'s

Supp. App'x T ¶¶ 21-22.)

Lupean's deposition testimony comports with the employees' statements.  Lupean's

investigation concluded that defendant "was not paying additional half time for hours worked over

[forty]." (Lupean Dep., Def.'s App'x C at 18.)  In fact, she calculated that thirteen full-time A-1

employees averaged 44.5 hours per week in 2005, 2007, 2008 and 44.25 hours per week in 2006.

(Id. at 48-49, 51.)  She explained that, while fourteen of the seventeen employees she interviewed in

the course of her investigation said that they worked more than forty hours per week, defendant

instructed them to record having worked forty or fewer hours on their time sheets.  (Id. at 21, 37-38.)

Taken together, these specific accounts provided by the Secretary in the form of the loan officers'

sworn declarations and Lupean's testimony fulfill her obligation as the movant under Rule 56 to

support her allegations with specific facts based on personal knowledge.

Defendant must rebut this showing by "do[ing] more than simply show[ing] that there is

some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; see also Big Apple

BMW, 974 F.2d at 1362-63.  Instead, he must establish that a genuine dispute exists about whether

he committed the alleged overtime violations by demonstrating that a reasonable jury could find for

him based upon the evidence he offers.  Liberty Lobby, 477 U.S. at 248; Doe, 480 F.3d at 256.

Defendant does not demonstrate that A-1's employees were paid the overtime owed to them; instead,

he denies that any overtime was owed to them at all.  The evidence defendant cites consists of (1) his

own affidavit, (2) Mrs. Makozy's deposition testimony, and (3) references to the time sheets submitted by A-1's employees.  That evidence is problematic.

A thorough review of defendant's affidavit reveals that it is insufficient to defeat the Secretary's motion with respect to the overtime issue.  <u>Blair</u>, 283 F.3d at 608.  Paragraph 7 reads:

> During the course of my consulting with A-1 Mortgage, employees were required to submit time sheets for each week they worked, which sheets [sic] were to detail the hours worked by each employees [sic].  The employees in fact did submit such time sheets, and it is my belief that all time sheets accurately reflected hours worked.  At all times, employees were required to accurately report all hours worked.  Additionally, employees at all times were required to seek Maria Makozy's approval for any overtime hours that they desired to work, and at no time,[sic] did any employee request to work any overtime hours.

(Gregory Makozy Aff., Def.'s App'x B ¶ 7.)  Defendant's affidavit cannot sustain his opposition to the Secretary's motion because the assertions contained in his affidavit consist of conclusory denials, rather than the "specific facts," <u>Maldonado</u>, 757 F.2d at 51, and "affirmative evidence" required. <u>Liberty Lobby</u>, 477 U.S. at 257.  Furthermore:

> the facts introduced [in an affidavit] must be alleged on personal knowledge.  Thus, ultimate or conclusory facts and conclusions of law, as well as statements made on belief or "on information and belief," cannot be utilized on a summary-judgment motion. Similarly, the mere reargument of a party's case or the denial of an opponent's allegations will be disregarded . . . .

10B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, & Richard L. Marcus, Federal Practice and Procedure § 2738 (3d ed. 1998) (internal citations and footnotes omitted).

A sentence-by-sentence examination of paragraph 7 reveals why defendant's affidavit is insufficient to oppose the Secretary's motion with respect to the overtime issue.  Defendant first states that A-1's "employees were required to submit time sheets for each week they worked, which sheets [sic] were to detail the hours worked by each employees [sic].  The employees in fact did

submit such time sheets, and it is my belief that all time sheets accurately reflected hours worked."
(Gregory Makozy Aff., Def.'s App'x B ¶ 8.)

Defendant's statement that " **it is my belief** that all time sheets accurately reflected hours worked" is a statement of defendant's personal belief rather than a statement of fact.   (Gregory Makozy Aff., Def.'s App'x B ¶ 8 (emphasis added).)   Courts of appeals have repeatedly held that statements of personal belief will not suffice in the summary judgment context.   See, e.g., Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (plaintiff's affidavit failed to create genuine fact issue where "[t]he entire content of the affidavit is conclusory, it does not set forth facts of which the plaintiff has personal knowledge and it does not give specific facts, but only generalities"); Roslindale Co-op. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981) (affirming district court's grant of summary judgment after finding the affidavits at issue insufficient because they "are merely conclusory reiterations of the allegations of the complaint, and even at that are often not made on personal knowledge"); Ward v. United States, 471 F.2d 667, 670 (3d Cir. 1973) (deeming affidavits that could not have been based on affiants' personal knowledge "clearly insufficient" to rule out operational negligence); Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972) ("Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment."); McShane Contracting Co., Inc. v. U. S. Fid. & Guar. Co., 61 F.R.D. 478, 481 (W.D. Pa. 1973) ("Admittedly, the affidavit is no place for ultimate facts and conclusions.")

Defendant's statements in paragraph 7 that "it is my belief that all time sheets accurately reflected hours worked, and that "[a]t all times, employees were required to accurately report all hours worked," are not predicated on evidence but, admittedly, upon his personal belief.

Defendant's "belief" that A-1's employees conformed to the requirement to accurately report their hours on their time sheets will not suffice to create a genuine issue for trial.

The remainder of paragraph 7, that "employees at all times were required to seek Maria Makozy's approval for any overtime hours that they desired to work, and at no time,[sic] did any employee request to work any overtime hours," is of no avail to defendant for similar reasons. (Gregory Makozy Aff., Def.'s App'x B ¶ 7.)  It was Mrs. Makozy, and not defendant himself, who he states was responsible for handling overtime requests.  It follows, therefore, that it would have been Mrs. Makozy – and not defendant – who would have known which employees requested to work overtime.  Defendant does not claim to have had any personal involvement in the interactions between Mrs. Makozy and any A-1 employees with respect to this policy.  Making the reasonable inference, as the court must, that employees seeking to work overtime would have acted in conformity with the policy and sought approval from Mrs. Makozy, defendant would not have had personal knowledge of who sought approval to work overtime.[14]  In the Third Circuit, affidavits that could not have been based on an affiant's personal knowledge are "clearly insufficient."  See Ward, 471 F.2d at 670.  Defendant's affidavit is, therefore, insufficiently based upon statements of belief and lacks the factual support founded upon personal knowledge necessary to oppose the Secretary's motion for summary judgment.

Second, when viewed in the light most favorable to defendant, Mrs. Makozy's testimony with respect to A-1's bi-weekly payroll system is not relevant to the determination whether the loan officers were owed an overtime premium.  Although defendant does not cite to specific exchanges in his brief, the record reveals only two instances that might be related to the overtime issue in any

---

[14] Because of these deficiencies with paragraph 7, the court need not consider, for the limited purposes of evaluating whether the affidavit generates a genuine factual dispute, whether the employees actually worked more than 40 hours.  It is worth noting, as the Secretary persuasively points out, that defendant's affidavit asserts that the loan officers did not "request to work any overtime hours."  (Gregory Makozy Aff., Def.'s App'x B ¶ 7.)  He does not, however, deny the material claim – that they actually worked more than forty hours in a workweek.

way:  one in which Mrs. Makozy states that employees "were required to fill [time sheets] out," and another in which she explained that time sheets were used to keep track of the employees' hours instead of computers.  (Makozy Dep., Def.'s App'x D at 60, 83.)  At the summary judgment stage, the court is obliged draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party.  Doe, 242 F.3d at 446.  No reasonable inferences, however, can be drawn from Mrs. Makozy's testimony that would give rise to a genuine issue of material fact with respect to overtime, as the testimony was simply not relevant to that issue.

Third, like the statements contained within his affidavit, defendant's cursory claims in his brief that the loan officers were paid in accordance with the time sheets showing that they worked forty hours per week and that these time sheets accurately reflected the hours they worked lack the factual underpinnings necessary to oppose the Secretary's motion.  Defendant's references to the time sheets constitute denials and "bare assertions" that are insufficient to defeat the evidence adduced in the Secretary's showing.  See Celotex Corp., 477 U.S. at 325.

Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," Rule 56 permits a court to "grant summary judgment where the movant's motion and supporting materials . . . show that the movant is entitled to it . . . ."  Fed. R. Civ. P. 56(e)(3).  On the other hand, in order to successfully oppose a motion for summary judgment, the nonmovant must cite "facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir.2006); Hanscom v. Carteret Mortgage Corp., CIV.A. 1:06-CV-2483, 2008 WL 4845832, at *2 (M.D. Pa. Nov. 5, 2008).  The court is mindful of the complicated issues that can arise when both parties rely on affidavits to support their arguments at the summary judgment stage.  The Court of Appeals for the Third Circuit has discussed this very issue:

> This trial "on paper" differs from a trial before a jury in one significant detail:  "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  This does not require a court to turn a blind eye to the weight of the evidence; the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.

Big Apple BMW, 974 F.2d at 1363 (ellipsis in original) (parallel citations omitted).  Because the record does not contain any factual support for the proposition that A-1's employees did not work more than forty hours per week – particularly in the face of the specific instances detailed repeatedly in Lupean's testimony and the employees' declarations – the record does not indicate anything more than "metaphysical doubt" in defendant's favor.

The Supreme Court has made explicitly clear that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Liberty Lobby, 477 U.S. at 247-48.  The Court specified that an issue is not genuine if "it is so one-sided that one party must prevail as a matter of law."  Id. at 252.  Considering this evidence as a whole in the light most favorable to defendant, a reasonable jury could not find for him on the issue of overtime.  Accordingly, no genuine dispute exists about whether defendant violated § 7 of the FLSA, and the Secretary's motion will be granted on this issue.

### D.  The FLSA's Recordkeeping Provisions

Section 11(c) of the FLSA requires employers to "make, keep, and preserve" accurate employment records.  29 U.S.C. § 211(c); see Williams v. Tri-County Growers, Inc., 747 F.2d 121, 128 (3d Cir. 1984) (explaining that § 11(c) "requires employers to maintain accurate records to ensure that all workers are paid the minimum wage for every hour worked"), abrogated on other grounds, Pullman-Standard v. Swint, 456 U.S. 273, 287 (1982).  The employment records must

include, among other information, employees' hours worked per day, hours worked per week, total daily or weekly straight time, and overtime premiums due.  29 C.F.R. §§ 516.2(a)(7)-(9).  The employer bears the burden of maintaining these records.  Tri-County Growers, 747 F.2d at 128 (making clear that § 11(c) "requires employers to maintain accurate records to ensure that all workers are paid the minimum wage for every hour worked").  Employers may not estimate employees' hours worked, id., or manipulate the records to reduce the number of hours worked.  See Donovan v. White Beauty View, Inc., 556 F. Supp. 414, 416-17 (M.D. Pa. 1982) (holding that employer violated FLSA by falsifying records in order to reduce employees' hours worked).

The Secretary produced substantial evidence to support her motion for summary judgment on the issue whether defendant violated § 11(c)'s recordkeeping requirements, including Lupean's deposition testimony and declaration and the signed declarations of several former A-1 employees. In total, eleven former employees stated that their time sheets did not accurately reflect the hours that they worked, in some cases because they did not fill out time sheets at all.

Some employees averred that defendant instructed them to alter their time sheets so that they showed only forty hours per week, despite the fact that the employees' actual hours worked exceeded forty, in order to present the appearance of compliance with the FLSA's provisions.  For example, Cipra, Tom Henderson ("Henderson"), and Minutello declared that defendant did not permit them to show more than forty hours per week on their time sheets, even if their actual hours worked deviated from or, in the case of Cipra and Minutello, regularly exceeded that number. (Cipra Decl., Pl.'s App'x I ¶ 34; Henderson Decl., Pl.'s App'x K ¶¶ 24-25; Minutello Decl., Pl.'s App'x O ¶ 31.)

Minutello and Stuber stated that defendant returned time sheets they had filled out accurately, with instructions to reduce their total hours to forty.  (Minutello Decl., Pl.'s App'x O ¶ 33; Stuber

Decl., Pl.'s App'x Q ¶ 22.)  Minutello declared that defendant told him to "change the starting time to make [his time sheet] look more authentic." (Minutello Decl., Pl.'s App'x O ¶ 34.)  Gentry stated that defendant requested that he fill out backdated time sheets that did not accurately reflect the hours he worked and that defendant instructed him to indicate on some time sheets that he took time off when, in actuality, he had worked.  (Gentry Decl., Pl.'s Supp. App'x J ¶¶ 27-30.)  Henderson, Minutello, and Stuber reported that defendant required them to show one-hour lunch breaks on their time sheets whether or not they actually took lunch breaks.  (Henderson Decl., Pl.'s App'x K ¶ 26; Minutello Decl., Pl.'s App'x O ¶ 32; Stuber Decl., Pl.'s App'x Q ¶ 21.)  Stuber did not take lunch breaks at all, and Minutello, who often skipped lunch, stated that he never exceeded half an hour when he did take one.  (Minutello Decl., Pl.'s App'x O ¶¶ 23, 26-27, 32; Stuber Decl., Pl.'s App'x Q ¶ 21.)

Lupean discussed defendant's alleged recordkeeping violations extensively in her deposition testimony.  Lupean testified that the time sheets defendant provided her in the course of her investigation "were false." (Lupean Dep., Def.'s App'x C at 34-35.)  She testified to her findings, over the course of her investigation, that A-1's records understated the number of hours the employees worked, defendant permitted employees to show only forty hours worked per week on their time sheets even if they exceeded that number, and two employees did not keep records at all while working at A-1 but were asked by defendant to return later "and fill out time sheets after the fact." Id. at 18-19, 38.  When asked by defense counsel whether, aside from the employee interviews she had conducted, she could provide additional support for her conclusions that defendant had falsified the time sheets, she explained that defendant retained the ultimate responsibility to maintain accurate records:

> Q.    Other than interviewing these employees, did you do anything to verify the fact that they worked additional hours that weren't recorded on the time sheets?
>
> A.    There was nothing else to review.  Since these records that were produced by [defendant] were false, there would be nothing else to review to check for hours as far as I recollect.
>
> Q.    If there was no additional information to review, how were you able to determine the amount of the additional hours worked by each employee?
>
> A.    Well, under the Fair Labor Standards Act, it's the employer's requirement to record daily and – accurate records of daily and weekly hours worked.  If an employer does not have that, then we determine based on interviews.

Id. at 38-39.  In this manner, the Secretary provided specific evidence, based upon employees' personal knowledge, consistently showing that defendant failed to maintain accurate records in volition of § 11(c).  Defendant's evidence, which consists of his own affidavit and the unextracted deposition of Mrs. Makozy, is insufficient to rebut this showing.  Defendant denies that he instructed A-1's employees to falsify time sheets, but this evidence lacks the factual underpinnings, grounded in specific instances, necessary to sustain these denials.

First, defendant does not point to a specific portion of the transcript of Mrs. Makozy's deposition in order to support his denials, and the court's review of the transcript reveals no statements that can be reasonably inferred to provide such support.  If defendant means to refer to Mrs. Makozy's statements that the employees "were required to fill [time sheets] out," and that time sheets and not computers were used to keep track of the employees' hours, these references do not create a genuine dispute about whether defendant kept accurate records for FLSA purposes.  (Makozy Dep., Def.'s App'x D at 60, 83.)  Even though the court must draw all reasonable inferences from the record at the summary judgment stage, Doe, 242 F.3d at 446, its can only be inferred from Mrs. Makozy's testimony that A-1 did, in fact, use time sheets to keep track of its employees' hours – a fact that, on its own, is neither material nor in dispute.  Mrs. Makozy's general

testimony that A-1 utilized time sheets to record employees' hours does not, therefore, establish that defendant maintained accurate records pursuant to § 11(c).

Second, for the reasons discussed extensively with respect to the previous issue, paragraph 8 of defendant's own affidavit similarly fails to provide the specific facts necessary to sustain his denials. The Supreme Court has noted that "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the non-movant] does not so respond, summary judgment, if appropriate, shall be entered against him." Matsushita, 475 U.S. at 586 n.11 (emphasis added) (quoting Fed. R. Civ. P 56(e)); see Saldana, 260 F.3d at 232. Defendant's affidavit, in which he restates his "belief that all time sheets accurately reflected hours worked," does not meet this burden. (Gregory Makozy Aff., Def.'s App'x B ¶ 7.) "[C]onclusory, self-serving affidavits" like defendant's are insufficient to defeat a summary judgment motion. See Blair, 283 F.3d at 608 (3d Cir. 2002); Maldonado, 757 F.2d at 51; Olympic Junior, 463 F.2d at 1146 ("Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment."). Furthermore, "the facts introduced must be alleged on personal knowledge," and "statements made on belief or 'on information and belief' . . . cannot be utilized on a summary judgment motion." WRIGHT AND MILLER, § 2738; see Olympic Junior, 463 F.2d at 1146 (explaining that "factual allegations not based on personal knowledge would be insufficient to avoid summary judgment"). Paragraph 7 of defendant's affidavit, with its statement that "it is my belief that all time sheets accurately reflected hours worked," is based solely upon his belief, not his personal knowledge. For this reason, it is insufficient to support his opposition to the Secretary's motion. (Gregory Makozy Aff., Def.'s App'x B ¶ 7.)

Defendant attempts to bolster his denial that he violated § 11(c) by alluding to an A-1 policy requiring employees to record accurately their hours.  (See Gregory Makozy Aff., Def.'s App'x B ¶ 7.)  Drawing the reasonable inference that this policy did in fact exist, defendant does not provide the additional factual support necessary to establish that the employees actually complied with it.  Finally, defendant argues that the time sheets themselves evidence the fact that he maintained accurate records for § 11(c) purposes.  Lupean, however, testified that she determined in the course of her Wage Hour investigation that the time sheets had been falsified – a finding corroborated by the employee declarations discussed above.  Defendant's argument is conclusory and he failed to adduce factual support for his belief.

The Court of Appeals for the Third Circuit has held that a party opposing summary judgment "may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence."  Big Apple BMW, 974 F.2d at 1363 (citing Liberty Lobby, 477 U.S. at 256-57.  Defendant, however, has not done so with respect to the recordkeeping issue.  Based upon the evidence discussed above, a reasonable jury could render a verdict in favor of defendant with respect to this claim.   The Secretary's motion for summary judgment on this issue will, therefore, be granted.

### E. Damages

The Secretary argues that, because defendant's alleged violations of § 6, § 7, and § 11(c) of the FLSA were willful, he is liable for back wages in an amount representing the unpaid wages and overtime premiums owed to A-1's employees over the course of three years, as well as an award of liquidated damages equal to this amount.  The Secretary further seeks injunctive relief under 29 U.S.C. § 217, which authorizes "district courts . . . , for cause shown, to restrain violations of section 215 of this title," 29 U.S.C. § 217 (2006) ("§ 17").  Section 215 prohibits employers from violating

§ 6, § 7, and § 11(c) of the FLSA.  29 U.S.C. § 215(a)(2), (5) (2006).  The court will respond to each request for relief in turn.

### 1.  *"Willfulness"*

The Secretary first moves for summary judgment on the issue whether back wages are appropriate.  Specifically, the Secretary seeks a back wages award of $68,272.11 based upon Lupean's calculation of the amount of unpaid minimum wages and overtime compensation that defendant failed to pay the twenty-one affected A-1 employees.  Because this calculation spans a three-year time frame,[15] the court must first determine whether defendant's violations of the FLSA, as discussed above, were willful.

A violation is "willful" within the meaning of the FLSA when "the employer either knew or showed reckless disregard" for whether the conduct in question violated the statute.  McLaughlin, 486 U.S. at 133.  In adopting this definition, the Supreme Court expressly endorsed the standard it set forth in Trans World Airlines, Inc. v. Thurston, which encompassed conduct evidencing "a disregard for the governing statute and an indifference to its requirements."  469 U.S. 111, 117 (1985); Selker Bros., 949 F.2d at 1296.  The Court of Appeals Third Circuit has also acknowledged "indifference" as a marker of willful conduct in this context.  See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1108 (3d Cir. 1995); Selker Bros., 949 F.2d at 1296.

Because the court determined above that the Secretary is entitled to summary judgment on her claims that defendant violated §§ 6, 7, and 11(c), the analysis now turns to whether these violations were "willful" within the meaning of the FLSA.  A willful violation involves an

---

[15]  The FLSA employs a two-tiered statute of limitations that has evolved over time.  Initially, FLSA claims were governed by state statutes of limitations.  As part of the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 16, 251-62, Congress enacted a two-year statute of limitations in order to limit employers' unanticipated contingent liabilities under the FLSA. In 1966, Congress created an exception that extends the limitations period to three years for willful violations. McLaughlin, 486 U.S. at 132.

employer's knowledge or "reckless disregard" of, McLaughlin, 486 U.S. at 133, or indifference to the FLSA's requirements.  Thurston, 469 U.S. at 117; Selker Bros., 949 F.2d at 1296.

The Thurston standard has been satisfied where an employer had reason to suspect that his conduct violated the FLSA, but did not make a good faith effort to confirm this information and comply.  Selker Bros., 949 F.2d at 1296 (holding that gas station operator willfully violated the FLSA where he suspected that paying gas station operators a percentage of gas sold in lieu of minimum wage might be illegal but continued to do so in order to keep his overhead costs down).  Courts have also found the requisite knowledge or indifference where the employer has a history of past FLSA violations.  See, e.g., Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999) (affirming the district court's finding of willfulness on a record indicating that defendant "had been investigated for violations twice in the past, paid unpaid overtime wages, received explanations of what was required to comply with the Act, and assured the DOL that he would comply in the future").

Here, as in Selker Brothers, the record supplies ample evidence that, at the very least, defendant had reason to suspect that his conduct ran afoul of the FLSA.  For example, Gentry's declaration recounts an exchange on or around May 5, 2008 in which defendant told him that if he "was contacted by the Department of Labor, to tell them that [he] had no complaints and was paid every two weeks, even though [he] was only paid when [he] closed a loan."  (Gentry Decl., Pl.'s Supp. App'x J ¶ 31.)  Similarly, Stuber declared that defendant "told [her] that the Department of Labor told him that [she] must show time off for lunches on my time sheet, even though [she] did not take a lunch break."  (Stuber Decl., Pl.'s App'x Q ¶ 23).  These instances indicate defendant's awareness of the FLSA's requirements with respect to the minimum wage, overtime, and recordkeeping, as well as his willingness to violate them.

Like the employer in <u>Palo Group</u>, defendant's history of past FLSA violations lends further support to the Secretary's argument that the violations in the present action were willful. Defendant had been investigated by Wage Hour twice before: between 2001 and 2003 and again between 2003 and 2004. As a result, he signed a stipulation and a consent judgment in 2004 agreeing to comply with the FLSA's requirements in the future. After the 2004 investigation and resulting consent judgment, defendant faced civil penalties and was enjoined from violating the FLSA again.

Preliminarily, defendant argues that even if he had violated the FLSA, he could not have done so willfully because an opinion letter issued by the DOL in September 2006 interpreted the FLSA in such a way as to include mortgage loan officers within its administrative exemption.[16] (<u>See</u> Opinion Letter FLSA2006-31 from Paul DeCamp, Adm'r, DOL (Sept. 8, 2006) ("Opinion Letter"), Def.'s App'x A (ECF No. 94-1) at 1, 7.) Where they apply, opinion letters expressing an agency's interpretation of a statute normally carry "considerable weight." <u>Reich v. Gateway Press, Inc.</u>, 13 F.3d 685, 692 (3d Cir. 1994) (citing <u>Pension Guar. Corp. v. LTV Corp.</u>, 496 U.S. 633 (1990), in which the Supreme Court afforded <u>Chevron</u> deference to three opinion letters).

Defendant's apparent argument that this letter precludes a finding of willfulness lacks support because the interpretation contained within the letter did not apply to A-1. The critical paragraph of the letter reads as follows:

> You acknowledge in your request [for an opinion] that the administrative exemption required payment on a salary or fee basis at a rate of not less than $455 per week. While you do not specify the particular compensation arrangements for the mortgage loan officers

---

[16] Statutorily exempted from the FLSA via 29 U.S.C. § 213(a)(1), an "administrative" employee is any employee:

> (1) Compensated on a salary or fee basis at a rate not less than $455 per week . . . ;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

> in question, you ask that we assume in responding to your request
> that they are paid on a salary basis at a rate of at least $455 per week.

(Opinion Letter, Def.'s App'x A at 2.)  This language reveals that the letter applied[17] exclusively to

salaried loan officers.   According to the Wage Hour investigation that gave rise to the present

action, at least twenty of A-1's loan officers were paid strictly on commission.  (JCS ¶ 31.)  The

record also contains the affidavits of ten former loan officers who stated that they were paid purely

on a commission basis and were not, in fact, paid salaries.  (Carpenter Decl., Pl.'s App'x G ¶ 27;

Ciminera Decl., Pl.'s App'x H ¶ 33; Cipra Decl., Pl.'s App'x I ¶¶ 3, 36; Gentry Decl., Pl.'s Supp.

App'x J ¶ 19; Hetes Decl., Pl.'s App'x L  ¶ 26; Minutello Decl., Pl.'s App'x O ¶ 35; Noland Decl.,

Pl.'s App'x P ¶ 22; Stuber Decl., Pl.'s App'x Q ¶ 24; Horan Decl., Pl.'s Supp. App'x S ¶ 24;

Stadelmyer Decl., Pl.'s Supp. App'x T ¶¶ 28, 36.)

The record is devoid of any evidence to the contrary.  It is, therefore, undisputed that the loan

officers in question were not, in fact, paid salaries of at least $455 per week – the assumption upon

which the DOL predicated its opinion letter.  For this reason, the DOL's opinion letter did not apply

to the A-1 loan officers affected by the violations alleged by the Secretary in the present case.  The

opinion letter alone is not sufficient to evade a finding of willfulness.

Defendant bases his argument that he did not willfully violate the FLSA almost entirely upon

his reliance on the DOL opinion letter; in the alternative, he denies that he violated the FLSA at all.

In his brief, defendant denies that "a violation of the Act ever occurred," explaining that "if there

was no violation of the Act, there could be no **willful** violation of the Act.  (Def.'s Br. in Opp. to

Pl.'s Mot. for Summ. J. ("Def.'s Br.") (ECF. No. 93), at 7 (emphasis added).)  These arguments,

---

[17] The Secretary argues in her reply brief that the opinion letter does not apply because it "was subsequently withdrawn." (Pl.'s Reply Br. at 8.)  Indeed, the DOL withdrew Opinion Letter FLSA2006-31 in 2010.  (Def.'s App'x A at 1.)  It is important to note, however, that the investigation giving rise to the present action ended on May 30, 2008, nearly two years before the letter was withdrawn.  (JCS ¶ 29.)  It can be reasonably inferred that the letter was still in effect from its September 8, 2006 issue date through the end of the time period relevant to this complaint.  (Def.'s App'x A at 1.)

which essentially restate the denials of the pleadings and do not contain the factual underpinnings Rule 56 requires, will not suffice to withstand the Secretary's motion. Matsushita, 475 U.S. at 574 (nonmovant "may not rest upon the mere allegations or denials of the . . . pleading"); see also Saldana, 260 F.3d at 232. Defendant argues that "his position is corroborated by the deposition testimony of Maria Makozy," but does not cite to any specific material in the transcript. (Def.'s Br. at 7.) This statement fails to satisfy Celotex Corp.'s "specific facts" requirement. Celotex Corp., 477 U.S. at 323 (requiring nonmovant to "set forth specific facts showing that there is a genuine issue for trial"). More importantly, however, when viewed in the light most favorable to defendant, Mrs. Makozy's testimony does not provide any support for defendant's denials that he violated the FLSA, willfully or not, for the reasons set forth in the preceding sections. In any event, it also fails to "present affirmative evidence" as Liberty Lobby requires. Liberty Lobby, 477 U.S. at 257.

The Secretary, on the other hand, met her burden under Rule 56 to provide "specific facts" demonstrating that a reasonable jury could not find for defendant. Celotex Corp., 477 U.S. at 323. Because no genuine dispute exists, see Liberty Lobby, 477 U.S. at 248, and the court finds as a matter of law that defendant willfully violated the FLSA, the Secretary's motion for summary judgment will be granted on this issue. Because defendant's violations of the FLSA were willful, the applicable statute of limitations is three years. See McLaughlin, 486 U.S. at 132. Accordingly, the three-year period over which the Secretary seeks back wages is permissible.

### 2. Back Wages

The Secretary moved for summary judgment on the issue whether back wages in the form of unpaid minimum wages and overtime premiums are owed to twenty-one affected A-1 employees. (See Pl.'s Br. in Supp. of Mot. for Summ. J. (ECF No. 89) at 17.) In pertinent part, § 16 of the FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 . . .

shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be . . . ."  29 U.S.C. § 216(b) (2006) ("§ 16(b)").

Because the court has determined as a matter of law that defendant violated §§ 6 and 7, the Secretary is entitled to claim back wages under § 16(b).  The question becomes whether the amount of back wages the Secretary seeks is appropriate under circumstances in which defendant failed to maintain adequate records of employees' hours under 11(c).  The Supreme Court has held that, where "the employer's records are inaccurate or inadequate," an employee pursuing a FLSA claim has met his burden of establishing the amount of back wages:

> if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946), superseded by statute on other grounds, Carter v. Panama Canal Co., 463 F.2d 1289 (D.C. Cir. 1972).  Following these instructions, the Court of Appeals for the Third Circuit has likewise held that an approximation will suffice in absence of accurate records.  See Reich v. Gateway Press, Inc., 13 F.3d 685, 701 (3d Cir. 1994); Selker Bros., 949 F.2d 1286, 1297 (permitting "the Secretary to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred").

The court determined above that defendant failed to maintain accurate records in violation of the FLSA's recordkeeping requirements.  The Secretary must therefore "produce[] sufficient evidence to show the amount and extent" of the work performed by A-1's employees from which a

reasonable inference as to the amount of back wages can be drawn. <u>Mt. Clemens Pottery</u>, 328 U.S. at 687. Because Lupean concluded in the course of her investigation that the employees' time sheets were unreliable, she based her calculation on other information. Specifically, she relied on other documents and interviews to determine the employees' dates and hours worked based upon descriptions of typical workweeks, amount and frequency of overtime, and vacation and sick days on which employees were off. (Lupean Decl., Pl.'s App'x A (ECF No. 89-1) ¶¶ 22-23.) She also averaged employees' hours worked per week in order to calculate the mean. (<u>Id.</u> ¶ 24.) Lupean estimated the actual pay date based upon the correlation between the allegedly withheld payroll checks' processing dates and the dates on which the loan officers' A-1 commission checks were issued. (<u>Id.</u> ¶ 26.)

In order to calculate the employees' minimum wages due, Lupean multiplied an employee's total hours worked over a given pay period by the minimum wage rate. (<u>Id.</u> ¶ 27.) She then totaled any commission and payroll checks the employee deposited during that pay period; if the amount paid exceeded the minimum wages due to the employee, defendant was credited with paying that employee the minimum wage for that particular pay period. (<u>Id.</u> ¶¶ 28-29.) If the amount of minimum wages due exceeded the amount paid, the difference became the unpaid minimum wage amount. (<u>Id.</u> ¶ 30.) When the total amount of the paychecks deposited did not cover the minimum wage and overtime due, Lupean deemed the difference unpaid overtime back wages. (<u>Id.</u> ¶ 31.) In total, she computed the back wages owed to the twenty-one affected A-1 employees to be $68,272.11. (<u>Id.</u> ¶ 32; <u>see also</u> <u>id.</u> at Ex. 6.)

Lupean's testimony and accompanying documents constitute "sufficient evidence" from which a reasonable inference as to the amount of back wages can be drawn. <u>Selker Bros.</u>, 949 F.2d

at 1297.  The burden then shifts to defendant to either "come forward with evidence of the precise

amount of work performed" or otherwise negate the specific facts provided by Lupean.

Defendant argues that, to the extent that back wages are due, Lupean incorrectly computed

the amount because she based her calculation largely on employee interviews instead of the

employees' time sheets.  Defendant's own evidence, which includes Inspector Lupean's unextracted

deposition testimony, however, reveals why this statement is problematic:

> Q.   Other than interviewing these employees, did you do anything
> to verify the fact that they worked additional hours that
> weren't recorded on the time sheets?
>
> A.   There was nothing else to review.  Since these records that
> were produced by Mr. Makozy were false, there would be
> nothing else to review to check for hours as far as I recollect.

(Lupean Dep., Def.'s App'x C at 38-39.)   "The employer cannot be heard to complain that the

damages lack the exactness and precision of measurement that would be possible had he kept records

in accordance with the requirements of [§] 11(c) of the Act."  Mt. Clemens Pottery, 328 U.S. at 688;

see also Selker Bros., 949 F.2d at 1298 ("Where employers have failed to comply with their statutory

duty to keep adequate records, courts have resorted to documentary evidence as a basis for inferring

hours worked.").  Accordingly, "[t]he burden of any consequent imprecision from the absence of an

employer's records must be borne by that employer."  Selker Bros., 949 F.2d at 1297.  Here,

defendant is no exception.

The Secretary established a valid claim of back wages as well as a reasonable basis from

which to infer that those back wages total $68,272.11, and defendant did not meet his burden to

show otherwise.  Because, considering the record as a whole in the light most favorable to defendant,

no reasonable jury could find otherwise, no genuine dispute exists with respect to back wages.  The

Secretary's motion with respect to back wages will be granted.

### 3.  Liquidated Damages

The FLSA also contains provisions allowing the Secretary to recover liquidated damages in an amount equal to that of unpaid wages where an employer has violated § 6 or § 7.  See 29 U.S.C. § 216(c) ("§ 16(c)").  Liquidated damages are intended to compensate employees who have been deprived of the minimum wages to which they are entitled by law for any additional losses they may have suffered as a consequence of this deprivation.[18]  Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945); Marshall v. Brunner, 668 F.2d 748, 753 (3d Cir. 1982).  In this way, liquidated damages are compensatory, rather than punitive, in nature.  Brooklyn Sav., 324 U.S. at 707.

Courts have recognized that liquidated damages are commonly awarded.  See, e.g., Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (7th Cir. 1986) (explaining that "[d]oubling is not some disfavored 'penalty.' . . . Double damages are the norm, single damages the exception").  The FLSA provides for a "strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith . . . and reasonable grounds for believing that [the] act or omission was not a violation.'"  Id. (alteration in original) (quoting 29 U.S.C. § 260 (2006)).  Accordingly, this court may deny the Secretary's claim for liquidated damages only if an employer can show good faith and reasonable grounds for failing to comply with the FLSA.  See Tri-County Growers, Inc., 747 F.2d at 127.  The "plain and substantial" burden to make this showing rests upon the employer.  Id. at 129 (emphasis omitted) (quoting Rothman v. Publicker Indus., 201 F.2d 618, 620 (3d Cir. 1953) (interpreting provision to mean that employer must "persuad[e] the court by proof that his failure to

---

[18] The Supreme Court has explained the policy underlying the liquidated damages provision as follows:
> It constitutes a Congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency, and general well-being of workers' [footnote omitted] and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being.

Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 (1945).

obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict")).

Here, defendant cannot meet his "plain and substantial" burden.  Rothman, 201 F.2d at 620. As explained above, the court finds as a matter of law that defendant violated §§ 6 and 7.  This finding creates a strong presumption in favor of awarding liquidated damages, and defendant has adduced no evidence to support a finding of good faith and reasonable grounds necessary to overcome this presumption.[19]  In fact, by instructing employees to alter their time sheets to reduce their hours worked and, in Gentry's case to report to the DOL, if questioned, that he had "no complaints" despite not being paid at least a minimum wage on a bi-weekly basis, defendant did just the opposite.  (See JCS ¶ 58.)

Defendant claims that the employees' time sheets were accurate and that the employees were accordingly paid.  In absence of any factual support or any citations to the record at all, defendant's "mere allegations or denials" cannot survive the Secretary's motion for summary judgment. Saldana, 260 F.3d at 232.  Accordingly, the Secretary's motion seeking $68,272.11 in liquidated damages, an amount equal to the award of back wages, will be granted.

### 4.  Injunctive Relief

The FLSA authorizes district courts to issue injunctive relief "restrain[ing] violations" of §§ 206, 207, and 211(c) upon a showing of cause.  29 U.S.C. § 217.  Whether to grant an injunction is within the court's sound discretion.  Dole v. Haulaway Inc., 723 F. Supp. 274, 288 (D.N.J. 1989) (citing Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 215 (1959)), aff'd, 914 F.2d 242 (3d Cir. 1990) (table).  Some courts have recognized that FLSA violations should be enjoined when the court is not fully convinced that a recurrence of the violation is not probable.  See, e.g., Marshall

---

[19] As discussed above, the DOL Opinion Letter explaining that salaried mortgage loan officers were exempt from the FLSA did not apply, as A-1's mortgage officers were paid on commission.

v. Van Matre, 634 F.2d 1115, 1118 (8th Cir. 1980) (recommending "injunctive relief, even if the employer is in present compliance, unless the district court is soundly convinced that there is no reasonable probability of a recurrence of the violations"); see also Mitchell v. Hausman, 261 F.2d 778, 780 (5th Cir. 1958) (recognizing "broad discretion of the district court to grant or deny injunctive relief"). Factors that district courts consider in deciding whether to issue an injunction include the employer's past conduct, current conduct, and, most importantly, whether the employer can be counted on to comply with the FLSA in the future. Reich v. Petroleum Sales, Inc., 30 F.3d 654, 657 (6th Cir. 1994).

Defendant argues that injunctive relief is unnecessary because he no longer has any connection to A-1, which is now bankrupt and defunct. His past conduct, however, compels the opposite conclusion. Despite two previous investigations by Wage Hour between 2001 and 2004, defendant nonetheless persisted in a pattern of behavior that violated the FLSA despite the stipulation and consent judgment he entered into in 2004. The latter imposed civil penalties and injunctive relief that nonetheless failed to deter defendant from engaging in conduct that again violated the FLSA, resulting in the present action. Such a troubling track record warrants injunctive relief. See Herman v. Hector I. Nieves Transp., Inc., 91 F. Supp. 2d 435, 450 (D.P.R. 2000) aff'd, 244 F.3d 32 (1st Cir. 2001) (granting injunction "[i]n light of the long and offensive history of non-compliance, [d]efendants' full knowledge of the Act's requirements, continuing violations of the overtime compensation, minimum wage, and record-keeping provisions of the Act, and the absence of any proposed plan by [d]efendants for remedying the situation").

The fact that A-1 is now defunct does little to guarantee that defendant will not run afoul of the FLSA again in the future, especially given his history of violating its provisions. For these reasons, injunctive relief is warranted, and the Secretary's motion on this issue will be granted.

### *V. Conclusion*

For the reasons detailed in this memorandum opinion, the Secretary has demonstrated, and defendant is unable to refute, that no genuine dispute exists as to any material fact and judgment as a matter of law in her favor is warranted on all of the issues raised.   The Secretary's motion for summary judgment will, therefore, be granted in its entirety.   An appropriate order will follow.

By the court,

*/s/ Joy Flowers Conti*
Joy Flowers Conti
United States District Judge

Date:   March 21, 2013